JOHN EGERTON and another *v.* HENRY S. BUCKNER and others.

Defendants, who were merchants, delivered to the plaintiffs, money brokers, a certain
 sum in notes of the Bank of the United States, and received from the latter another
 sum in Louisiana bank notes, with the understanding, that either party should be en-
 titled to demand the return of a like amount of such notes as were originally deliv-
 ered by them, on giving certain notice to the other.   Plaintiffs, having offered to
 return the amount of notes received by them, after giving the notice agreed upon,
 demanded those which they had delivered to defendants ; and, on the failure of the
 latter to restore them, notified them, that unless the amount was returned by a giv-
 en time, they, (plaintiffs,) would sell the United States Bank notes for what they
 would bring in the market, and hold defendants responsible for the difference be-
 tween the proceeds, and the value of the notes received by them.   Plaintiffs sold

Egerton and another v. Buckner and others.

the notes through a broker, and purchased them themselves, and sue for the differ-
ence. *Held*, that the real character of the transaction is one of mutual loans for
consumption—an agreement by the parties to deliver to each other a certain num-
ber of bank notes to be used by them respectively, under the obligation of returning
an equal amount of the same kind; that plaintiffs had no right to sell the notes as
they did, nor to purchase them themselves; that on defendants' refusal to receive
the notes, plaintiffs should have deposited them in some safe place, at the risk of
the former, and have proceeded to recover the amount of notes delivered by them,
under the provisions of arts. 2892 and 2893 of the Civil Code, at their value on the
day when defendants should have restored them, according to the stipulations of the
original agreement as to notice.

APPEAL from the Commercial Court of New Orleans, *Watts*,
J. The petitioners allege, that in January, 1842, they applied to
the defendants for a loan of notes of the Bank of the United States
to the amount of $14,000 ; that as those notes were then worth in
the current bank notes of New Orleans about seventy-two cents
on the dollar, they deposited in the hands of the defendants
$10,080 in New Orleans notes ; that it was agreed between the
parties that defendants should return the sum deposited with them,
when requested, at any time after two days notice, on receiving
from the petitioners a sum of $14,000 in notes of the Bank of the
United States, and that the latter should restore to the defendants
$14,000 in notes of the Bank of the United States, after six days
notice, and on receiving back the sum deposited with them by the
petitioners, &c. It is further averred, that on the 7th of Februa-
ry, 1842, petitioners notified defendants that they should require
the return of the money deposited with them, two days thereafter,
offering to pay back the $14,000 in United States Bank notes ;
that after the expiration of the two days, to wit, on the 10th of
February, they tendered to the defendants that sum, and demanded
the return of the amount deposited by them ; that defendants re-
fused to perform any part of this contract ; that being unable to
spare from their business the large sum placed in the hands of
the defendants, they sold, after notice to the latter, for their ac-
count, and for the best price that could be obtained, the said
$14,000 of notes of the Bank of the United States, the nett pro-
ceeds being $7105, leaving a balance due to petitioners of $2975,
for which they bring suit.

The defendants pleaded a general denial. The evidence ad-

duced on the trial is detailed in the opinion delivered by GARLAND, J. The lower court gave judgment for the plaintiffs, from which the defendants have appealed.

*Benjamin,* for the plaintiffs. The defendants were put *in mora.* The contract and its breach being clearly established, the law gives the plaintiffs the *choice,* to sue either for a specific performance, or for damages. Civil Code, art. 1920. "On the breach of *any* obligation to do or not to do, the obligee is entitled *either* to damages, or, in cases which permit it, to a specific performance of the contract, *at his option.*" The plaintiffs chose to sue for damages, because they could not afford to keep so large a sum of money locked up during the pendency of a suit for specific performance.

The plaintiffs having a right to damages, the only question remaining is, as to their amount? The answer is, the difference between the $10,080 which defendants ought to have paid for the $14,000 of United States Bank notes, and the market price of the latter when defendants were put in default. Now, the testimony is conclusive, that the market price on that day did not exceed fifty cents on the dollar. No one in town would give more. They were offered by the broker, to the defendants themselves, who, after refusing to purchase for several days, finally offered fifty cents on the dollar for them. No higher offer could be got; and the plaintiffs finally took them themselves at fifty-one cents on the dollar, and sued for the difference.

It is not contended that this was a real sale; the vendor and vendee being the same person : but we say, that no law required the plaintiffs to sell the notes at all. They might have kept them for their own account, and yet have sued for the difference between the price of seventy-two cents on the dollar, and the market price. The proof is conclusive, that nothing better could have been obtained for the notes than the price at which they were kept, and therefore the defendants owe the difference. If a man buys from me a barrel of flour for $10, deliverable on the 1st of January next, and refuses to take it when tendered on that day, the market price being then $5, I may surely make him pay me the $5 difference, whether I sell the flour to some one else, or consume it in my own family.

*L. C. Duncan* and *Eustis*, for the appellants. If the United States Bank notes are to be regarded as a pledge or pawn, they should have been sold at public sale; if as the property of the defendants, they could only be sold after judgment. *The Second Municipality* v. *Hennen*, 14 La. 559. *Wilbor* v. *M'Gillicuddy*, 3 Ib. 382. *Kelly* v. *Caldwell*, 4 Ib. 38.

GARLAND, J. This suit arises out of the following written instrument : " We have received from Buckner, Stanton & Co., $14,000, in United States Bank notes, and have paid them $10,080 in Louisiana bank notes, with the understanding, that whenever said Buckner, Stanton & Co. require the United States Bank notes, by giving five or six days notice, we are to return the said amount of United States notes, say $14,000, and they are to return to us the amount of Louisiana bank notes, say $10,080, by giving them two days notice. New Orleans, January 3d, 1842. (Signed,) EGERTON & Co."

The plaintiffs state in their petition, that " the motive for said agreement, on the part of Buckner, Stanton & Co., was to have the use of petitioners' money, until they should require to use their United States Bank notes, and the consideration or motive of petitioners was to realize the profit which they expected to make, by selling said United States notes, in New Orleans, and replacing them by others to be purchased at a lower rate at the north."

It is shown, that, on the 7th of February, 1842, the plaintiffs, in writing, informed the defendants, that they were ready to return to them the $14,000 in United States Bank notes, and demanded of them, the sum of $10,080 in *currency, or New Orleans money.* The person who made this demand says, that he had with him the $14,000 in United States Bank notes, when he delivered the letter. On the 10th of February, the plaintiffs again wrote to the defendants saying, that on the 7th, they had informed them that they were ready to return them the United States Bank notes, and had demanded the return of $10,080, in New Orleans currency, which had been given as security that the $14,000 should be returned ; and that, as that demand had not been complied with, they, the defendants, were further notified, that unless they returned the $10,080, in New Orleans funds, on or before

12 o'clock, of that day, they, the plaintiffs, would sell the $14,000 of United States Bank notes, for account of the defendants, and should any deficiency arise between the proceeds of the same, and the $10,080, that they, the defendants, would be held responsible for the same. On both occasions, it is in evidence that an agent, or friend of plaintiffs, had the United States Bank notes in his possession, and offered them to one of the defendants, who refused to receive them, and return the $10,080.

The United States Bank notes, were offered for sale by a broker, to a great number of persons. He could not get more than fifty cents on a dollar, offered for them; which sum, was offered by Buckner, one of the defendants; and finally, the plaintiffs themselves, bought them for fifty-one cents on the dollar, and now claim $2,975, the difference between the proceeds of the sale, and the sum of $10,080.

The evidence shows, that the motives stated in the petition actuated the parties. The plaintiffs are brokers, and were able to sell the United States Bank notes, in New Orleans, at seventy-two cents on the dollar; and the evidence shows, that those they purchased at the north, and had on the 7th and 10th of February, to return to the defendants, cost them only sixty cents on the dollar, less the commissions for purchasing, and there is no evidence of any such charge. The defendants were largely indebted to the Bank of the United States, which debts were not due, but they were preparing to meet them, by occasionally buying at a discount, the notes of the Bank. Not wanting, in the early part of January, 1842, to use the United States Bank notes, and having use for funds current in New Orleans, the defendants let the plaintiffs have them, as they could sell them at a profit, and buy others to replace them, before the defendants would have use for them, as was then supposed; and in return, they, the plaintiffs, let the defendants have the use of $10,080, in current funds, for the use of which, they no doubt expected to make a profit also.

There is a mass of testimony, as to a demand made by the defendants, on the plaintiffs, to return them the United States Bank notes, about the 20th January, 1842, and their successful efforts to procure them from the Merchants Bank, and the refusal of the defendant Buckner, to go with Egerton to the Bank to receive

them. Also, as to the means taken by the parties to put each other in default. There is also evidence to show, that since the plaintiffs, through their agent Goodman, purchased the United States Bank notes, at fifty-one cents on the dollar, they have been worth more. Hepburn, the broker they employed, says, "some small sales have been made since, at a higher rate; but he does not think that, for any amount in market, a higher rate could be got now. It is a great risk to buy, and large profits are expected." Bean says, that from the 25th of January, to 6th of February, those notes were at a discount of forty to forty-two per cent. He had $30,000, which were bought at forty-five cents discount. On the 16th or 17th of February, Smith says that he purchased of the plaintiffs, at fifty-eight and one-half cents to the dollar. This was a few days after plaintiffs had taken the $14,000 of Hepburn, their broker.

There was a judgment in favor of the plaintiffs, for $2,975, with interest, from which the defendants have appealed.

As to the question, whether the parties were in default, we do not consider it very material. If it be, we are satisfied, that Buckner did not, by the request he made of the plaintiffs, on the 19th or 20th of January, put them in default, according to the provisions of the Civil Code, arts. 1905 to 1907. He did not give them the requisite notice of five or six days, nor offer to comply with his part of the bargain; and it is not clearly shown, that the plaintiffs put the defendants *in mora*. On the 7th of February, they gave the defendants notice, that they were ready to return them the $14,000, in United States Bank notes. On the 9th, they commenced their suit for $2,975, as being the difference between the proceeds of the sale of the notes and the $10,080, and, on the next day, notified the defendants of their intention to sell them. The account of sales is not rendered, until the 14th or 15th of the same month; and the testimony of Hepburn does not state particularly the day, he sold to Goodman the agent of the plaintiffs. He says, it was some days previous to the 14th of February, and from all the circumstances, it would appear, that it was on the 9th, or the 10th. It appears that the plaintiffs knew the price on the 9th, as they then state in their petition, the deficiency claimed by them.

But it seems to us, that the real character of this transaction is one of mutual loans for consumption. It is an agreement by one of the parties, to deliver to the other, a certain quantity or number of bank notes, to be used by them respectively ; and the obligation is, to return as many, or as great an. amount, in the same kind or quality. In this point of view, each party became the owner of the thing lent, and if it had been lost or destroyed, the loss would fall on the party having possession. Civil Code, art. 2881, 2882. Article 2284 of the same code, declares, that the obligation which results from the loan of money, can never be more than the numerical sum mentioned in the contract. If there has been any augmentation or diminution in the value, before the time of payment, the debtor is only bound to return the numerical sum which was lent to him, in such money as has currency at the time of payment. If the thing lent be provisions, whatever be the increase or diminution in the price, the debtor or borrower is bound to return the same quantity, and quality, and no more. Art. 2886.

It is evident, that the parties did not intend to make an exchange, nor an absolute sale, nor one with the benefit of redemption. The transaction has not the essential qualities of either of such contracts. The plaintiffs say to the defendants, you have a certain amount in United States Bank notes, which you cannot or will not use at present ; we can use them to advantage, and will return them to you when you want them, upon giving us five or six days notice. The defendants agreed to do so, in consideration of getting the use of $10,080, in Louisiana bank notes, current at the time. The obligation was to return the same kind of thing.

These views of the case, bring us to the conclusion, that the plaintiffs had no right, after the defendants refused to receive the United States Bank notes, to sell them in the manner they did. They were not pledged to them, nor had they such rights as entitled them to proceed as in a case of sale, à la folle enchère. They were not the vendors of the notes, and if they had been, they did not proceed with the sale in a legal manner. They had no right to purchase the notes themselves, and thereby fix the deficiency. This doctrine has been well settled, since the cases

of *Scott's Ex'x* v. *Gorton's Ex'r*, and *The Second Municipality* v. *Hennen,* 14 La. 116, 559. We see, in this case, the consequences of permitting such purchases. The plaintiffs, through their agent, purchased the notes from their own broker at fifty-one cents on the dollar, and in a few days after, we find them selling the same kind of notes, perhaps the very same, at fifty-eight and a half cents on the dollar.

The transaction was simple enough in the beginning. The plaintiffs' obligation was to return the United States Bank notes, and when the defendants refused to receive them, they should have been deposited in some secure place, subject to their risk, and they should then have proceeded to recover their $10,080, in Louisiana bank notes, according to the provisions of articles 2892, 2893 of the Code. They seem to have been aware that such was the course for them to pursue, and state in their petition, that they could not spare from their business, the large amount they had placed in the hands of the defendants, and therefore sold the notes. We are consequently of opinion, that it is best to put the parties in a situation, where they can do that which they should have done in February last. We think, that upon the plaintiffs' giving the defendants $14,000, in United States Bank notes, they are entitled to recover $10,080, in Louisiana Bank notes, of such kind or value as they were entitled to receive on the 10th of February, 1842.

The judgment of the Commercial Court is therefore reversed, and the cause remanded for a new trial, with directions to the Judge to conform on the trial thereof, to the principles herein expressed, and otherwise, to proceed according to law ; the plaintiffs and appellees paying the costs of this appeal.

---

### SAME CASE—ON A REHEARING.

*Benjamin,* for the plaintiffs. Without entering into the question whether this contract was really a mutual loan for consumption, although it might perhaps be more correctly characterized

as a bargain for a future purchase and sale of the United States Bank notes at a price agreed on, it suffices that it is a *contract*. Now, in all contracts where one party violates his agreement, the other has a twofold remedy. He may, at his option, enforce a *specific performance*, or he may sue *for damages for the breach*. The plaintiffs have adopted the latter remedy, for the reasons alleged by them, viz. that they could not afford to lie out of their money, whilst suing for a *specific performance*. The court is, therefore, undoubtedly correct in saying that if the plaintiffs had deposited the $14,000 of United States Bank notes in a place of safety, after tendering them to the defendants, they might recover the $10,080 which they paid to the defendants. But the court has not the right to *compel* plaintiffs to sue for a specific performance ; nor has it the right to change this suit from one for damages into an action for specific performance, by remanding the cause with instructions to that effect. The *option* is *ours*. Civil Code, art. 1920. "On the breach of *any* obligation to do or not to do, the obligee is entitled either to damages, or in cases which permit it, to a specific performance of the contract, *at his option*."

Having established then that the plaintiffs have a right to maintain this action in the form which they have selected, and that they have legally put the defendants in default, there remains but one question : What is the amount of the damages ?

Whether the sale made by the broker to the plaintiffs be regular, or not, is a matter of no consequence. It was one way of ascertaining the amount of the damages. The defendants would not be the less liable to damages, if the United States Bank notes had remained to this hour in possession of the plaintiffs. If the court think, that on the day of the sale by the broker, the notes were worth more, then it will diminish the damages ; but no such proof appears on the record. If, however, the court deem an *actual* sale of the notes requisite, and that the plaintiffs' right to recover damages depends absolutely upon the fact of a sale, the proof is in the record of an actual sale at the very highest market price, viz. fifty-eight and one-half cents per dollar ; so that, by diminishing the amount of the judgment below, at the rate of seven and one-half cents on the dollar, the plaintiffs would be still entitled to a decree for nineteen hundred and twenty-five dollars.

The appellees earnestly urge upon the court, since its decree shows plainly that the equity is with the plaintiffs, not to remand the cause. The appellees are secured by an appeal bond signed by a surety, who has in his hands, as they are informed, ample indemnity. If the case be remanded they will be deprived of this security, and as the defendants are now bankrupts, the loss will be irretrievable.

*J. C. Duncan*, and *Eustis*, for the appellants. It is not perceived, that there is any matter presented by the counsel which has not already been considered by the court. It is not understood, that the position assumed by the court, that the case presents for consideration the obligations arising under mutual loans for consumption, is at all shaken. The right to sell on the default of the vendee, in the example stated, depends upon principles peculiar to the contract of *sale*. Where is the authority for extending them to the contract of *mutuum?* If the thing loaned is not returned at the time agreed on, the party in default pays interest. Civil Code, art. 2893. The plaintiffs have their action, on a case *properly made out*, for the sum loaned and the interest. On re-covering the money loaned, they must give back the notes borrowed.

It is understood, that the court does not admit the *standard of damages* assumed by the argument of the defendants' counsel; and as no authority is presented against the views of the court, no new argument is required in support of them. A more mature consideration of the subject will confirm them. The borrower has no right to take to himself the thing borrowed at the market price, and to sue for the difference between that and the value of the object loaned. This standard may be applicable to the contract of *sale alone*, but is inconsistent with the obligations of the contract under consideration.

GARLAND, J. A re-hearing was granted in this case, on an allegation and admission after the judgment, that there was a clerical error in the record, which misled the court on one point; and because a doubt was created in our minds by the ingenious arguments contained in the petition, which have induced us to re-examine the case with great care.

The correction of the record, by showing that the suit was

brought on the 19th of February, 1842, instead of the 9th, proves that the defendants were legally in default, about which fact some doubt was expressed in our opinion; but that point was one of minor importance in the case. The great objection with us was, the mode pursued in establishing the difference between the United States Bank notes, and those of the Banks of Louisiana, and thus fixing the measure of damages. We cannot agree that it was fair and legal for the plaintiffs, who are money brokers, to put the notes which they had to restore to the defendants, in the hands of another broker, to hawk about the streets of the city for a day or two, and then sell them to a partner of the plaintiffs in the transaction, and by this means fix a measure of damages. The giving countenance to any such principle, would lead to the most pernicious consequences.

It was well understood, when the original agreement was made, that the plaintiffs were to return to the defendants, the same description of notes they had received, and receive the same kind they had given; the plaintiffs, therefore, had no right to take every thing into their own hands, and by a combination fix the sum the defendants shall pay. The contract between the parties was not one of sale, and, therefore, the rules as to establishing the rate of damages are not applicable.

We will not, on such evidence as is before us, finally settle this controversy; nor can we be induced to do so, although it is urged that the defendants are now bankrupts, and that if the judgment is reversed, the claim of the plaintiffs will be lost. There is no evidence before us of the bankruptcy, nor any fact that induces the belief that the defendants are not as solvent now, as they were in February, 1842.

The former judgment remains unaltered.